## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **NALEX ENERGY, LLC** | § | |
| | § | |
| **Plaintiff/Counter-Defendant,** | § | |
| | § | |
| **VS.** | § | **Civ. No. 4:22-cv-01824** |
| | § | |
| **LAURITZEN BULKERS A/S,** | § | **FED. R. CIV. P. 9(h)** |
| | § | **Admiralty Claim** |
| **Defendant/Counter-Plaintiff.** | § | |

### NALEX'S MOTION TO DISMISS
### LAURITZEN'S FIRST AMENDED COUNTERCLAIM
### UNDER RULES 12(B)(6) AND 12(C)

Plaintiff/Counter-Defendant Nalex Energy, LLC ("Nalex") moves under Federal Rules of Civil Procedure 12(b)(6) and 12(c) to dismiss Lauritzen Bulkers A/S's ("Lauritzen") First Amended Counterclaim (ECF Doc. 26) for failure to state a claim. Lauritzen alleges in its counterclaim that Nalex sold contaminated bunker fuels, yet it admits in its pleadings that the parties' agreed-upon fuel tests confirmed the fuels were of good quality. Lauritzen's further admission that the parties' transaction is governed by Nalex's terms and conditions disposes of its argument that the results of the joint-analysis is not binding on the parties. Lauritzen has failed to state a cognizable claim, and dismissal is appropriate under Rule 12(b)(6), or alternatively Rule 12(c).

### Nature and Stage of Proceedings

Nalex filed this lawsuit against Lauritzen to collect amounts due and owing for marine fuel ("bunkers") that Nalex provided to Lauritzen's chartered vessel, the

M/V SHANGHAI (the "Vessel") on April 25, 2021.[1] Nalex asserts two breach-of-contract claims: (1) breach of a maritime contract for failing to pay for the marine fuels delivered; and (2) breach of a written promise to pay contingent on additional testing of the marine fuels, which confirmed that the marine fuels were of good quality.[2]

Lauritzen's answer to Nalex's First Amended Complaint was accompanied by its First Amended Counterclaim, alleging that the bunkers Nalex provided to the Vessel did not conform to the agreed quality specifications.[3]

Lauritzen's allegations over the quality of the bunkers are immaterial for two independent reasons. First, Lauritzen admits that Nalex's 2018 General Terms and Conditions (the "GTCs") govern the parties' rights and liabilities with respect to the subject bunker delivery.[4] These GTCs prohibit Lauritzen's counterclaim for damages arising from the alleged delivery of off-specification bunkers to the Vessel. Second, Lauritzen's claims must also be dismissed because Lauritzen independently agreed that the results of a joint sample analysis would be final and binding on the parties. Nalex therefore moves to dismiss Lauritzen's counterclaim as a matter of law.

---

[1] *See* Nalex's First Amended Complaint ("FAC") (ECF Doc. 21).

[2] *Id.*

[3] *See* Lauritzen's Answer to Nalex's First Amended Complaint and Lauritzen's Amended Counterclaim (ECF Doc. 26).

[4] *See id.* at ¶18.

2

## Summary of the Argument

The parties entered a contract for Nalex to supply bunkers to the Vessel. The parties' contractual rights and liabilities are governed by the GTCs.[5] Nalex contends that the bunkers delivered to Lauritzen were of good quality and met all contractual specifications. Indeed, after the Vessel rejected the bunkers, Nalex and Lauritzen agreed to use a joint testing procedure and to be bound by the results—and as Lauritzen admits, the results showed that the bunkers were within the contractual specifications. Lauritzen nonetheless counterclaims that it is entitled to damages from Nalex because the bunkers delivered to the Vessel contained cat fines[6] exceeding the permissible limits of the applicable ISO specifications.

The material facts are undisputed:

1) Nalex, through its delivery agent, Kirby Inland Marine, LP ("Kirby"), delivered bunkers to the Vessel via Kirby barge 27735;[7]

2) At the time of the delivery (and as specified by section 5.4 of the GTCs), Kirby's tankerman collected samples of the bunkers delivered to the Vessel from the barge's bunker manifold;[8]

3) The samples collected by Kirby's tankerman were identified by their seal numbers on a Marine Fuel Delivery Receipt (hereinafter "BDN") provided to the Vessel's Chief Engineer;[9]

---

[5] Nalex GTCs are attached as Exhibit 1.

[6] Cat fines, calculated by combining the aluminum and silicon content of the fuel, are a common refining by-product and are acceptable at or below certain levels.

[7] *See* Nalex's FAC at ¶11; Lauritzen's Answer at ¶11.

[8] Nalex's FAC, at ¶12, 13; Lauritzen's Answer, at ¶13, 24; Lauritzen's Counterclaim, at ¶48.

[9] Nalex's FAC, at ¶¶12, 13; Lauritzen's Answer, at ¶13.

4)   After Lauritzen submitted its quality complaint, the parties agreed to have well-known fuel-testing company AmSpec test one of the samples identified on the BDN to confirm the quality of the bunkers;[10]

5)   Lauritzen agreed that the results of AmSpec's analysis would be final and binding as per the GTCs;[11] and

6)   AmSpec's analysis of the sample confirmed that the bunkers met contractual quality specifications.[12]

Like most bunker suppliers, Nalex maintains explicit procedures in its GTCs to prevent the very kind of dispute that Lauritzen raises in its counterclaim—i.e., that Lauritzen may disregard the binding results of a joint sample analysis of the bunkers' quality. Lauritzen's argument fails because it is admittedly bound by these procedures and all other GTCs.

Nalex's GTCs—which again, Lauritzen admits govern the transaction—dictate that "only samples provided by [Nalex] to [Lauritzen] at the time of delivery shall be deemed representative of the product delivered."[13] These samples are identified on the BDN.[14] Nalex and Lauritzen agreed that AmSpec's analysis of the selected BDN sample would be final and binding.[15] Lauritzen admits that the analyses performed on the BDN sample resulted in a finding that cat fines were within permissible

---

[10] Lauritzen's Answer, at ¶¶ 21, 23.

[11] *Id.* at ¶20.

[12] *Id.* at ¶24.

[13] *Id.* at ¶26.

[14] Lauritzen's Counterclaim, at ¶48.

[15] *Id.* at ¶20.

levels.[16] Lauritzen cannot now renege on its agreement that the BDN sample is controlling and that AmSpec's on-spec analysis is binding and disposes of Lauritzen's after-the-fact quality dispute.

Lauritzen cannot deny that it agreed to this arrangement because it is spelled out in the GTCs. They expressly allow for Nalex "to have one of its retained sealed samples independently analyzed and for the results to be final and binding upon both parties."[17] Because the parties agree that the GTCs govern their rights and liabilities, Lauritzen's counterclaims must be dismissed with prejudice as a matter of law.

A second agreement as to the finality of the testing likewise bars Lauritzen's counterclaims. When Lauritzen first complained about the bunkers, it agreed with Nalex to submit one of the samples to an independent testing laboratory. The parties agreed upon the sample to be used and the lab that was to perform the testing. And they agreed that the results, whatever they were, would be binding. Again, those tests revealed that cat fines were within acceptable limits. Lauritzen now wants to back out—hence its counterclaims.  Those counterclaims fail as a matter of law because Lauritzen admittedly agreed that the binding test results would dispose of the matter. Lauritzen cannot state a plausible claim.

---

[16] Lauritzen's Answer, at ¶24 ("[Lauritzen] [a]dmits that the analyses performed on the BDN samples taken on the barge resulted in a finding of cat fines within the permissible levels of ISO-8217. . ."); Lauritzen's Counterclaim, at ¶48 (". . . laboratory analyses performed on the BDN samples taken on the barge . . . were on-specification because the cat fines levels from these samples (ranging from 12 ppm to 34 ppm) were within permissible levels under ISO-8217.").

[17] *Id.*

## Standard of Review

**A.    Standard to Dismiss Under Rule 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) requires that a complaint meet the pleading standards of Rule 8 so as to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (citations omitted). The complaint must "state a claim to relief that is plausible on its face," with allegations sufficient to "raise a right to relief above the speculative level." *Id.* at 555, 570. Thus, a complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal quotation marks omitted). Courts need not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Instead, courts must conduct a context-specific inquiry and rely on "judicial experience and common sense" to determine whether a plaintiff's "well-pleaded factual allegations . . . plausibly give rise to an entitlement to relief." *Id.* at 679.

"It is well known that when 'matters outside the pleading' are presented with a motion to dismiss under Rule 12(b)(6), a district court has complete discretion to either accept or exclude the evidence." *Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 783 (5th Cir. 2007) *(citing Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193 (5th Cir. 1988)); *Causey v. Sewell Cadillac-Chevrolet, Inc., 394 F.3d 285, 288 (5th Cir. 2004) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.") (internal citations omitted); *see also Lowe v.*

*ViewPoint Bank, Civ. Action No.* 3:12-CV-1725-G(BH), 2015 U.S. Dist. LEXIS 83919, 2015 WL 3939357, at *3 (N.D. Tex. June 26, 2015) (holding that, in context of a Rule 12(b)(6) motion, court had "complete discretion to either accept or exclude the evidence for purposes of determining the motion" (internal quotation marks omitted)). Because the parties agree that their rights and liabilities are governed by the GTCs, the Court should consider this Motion not only on the pleadings, but also on the GTCs.

**B.    Standard to Dismiss under Rule 12(c)**

Nalex moves alternatively under Rule 12(c). The standard for deciding a Rule 12(c) motion is the same as a Rule 12(b)(6) motion to dismiss. *Guidry v. Am. Public Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007). That is, when considering a Rule 12(c) motion for judgment on the pleadings, a court must accept as true all well-pleaded facts and must view them in a light most favorable to the plaintiff. *Guidry*, 512 F.3d at 180. "Pleadings should be construed liberally, and judgment on the pleadings is appropriate only if there are no disputed issues of fact and only questions of law remain." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 315, 312 (5th Cir. 2002) (*citing Hughes v. Tobacco Institute, Inc.*, 278 F.3d 417, 420 (5th Cir. 2001)). "The [district] court may dismiss a claim when it is clear that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* (*citing Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999)).

To survive a Rule 12(c) motion for judgment on the pleadings, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Guidry*, 512 F.3d at 180 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)). "Factual allegations must be enough to raise a right to relief above

the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citing *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965). Courts will not, however, "accept as true conclusory allegations or unwarranted deductions of fact." *Great Plains Trust Co.*, 313 F.3d at 313 (*citing Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)).

In deciding a Rule 12(c) motion, the court may consider documents that are referenced in the parties' pleadings and central to the plaintiff's claim; it may also take judicial notice of publicly filed documents. *Van Duzer v. U.S. Bank Nat'l Ass'n*, 995 F.Supp.2d 673, 685 (S.D. Tex. Jan. 31, 2014) (concluding that the court's consideration of documents attached to the complaint and public documents filed in another lawsuit did not convert a Rule 12(c) motion for judgment on the pleadings into one for summary judgment), *aff'd*, 582 F. App'x 279 (5th Cir. 2014).

## **Factual Background**

Nalex's First Amended Complaint seeks to recover from Lauritzen payment for fuel bunkers delivered to the Vessel under theories of breach of contract, quantum meruit, and suit on account.[18] Lauritzen (through its agent, Deal Energy) requested that Nalex supply the bunkers to the Vessel through Lauritzen's Bunker Nomination.[19] In response, Nalex issued a Confirmation Order memorializing the transaction and providing that all sales were subject to the GTCs.[20] After Nalex supplied the

---

[18] *See* Nalex's FAC (ECF Doc. 21).

[19] *Id.* at ¶ 7; *see also* Lauritzen's Answer, at ¶ 7.

[20] *Id.* at ¶ 8; *see also* Lauritzen's Answer, at ¶ 8.

bunkers to the Vessel, Lauritzen rejected Nalex's demand for payment, thereby breaching the parties' agreement. After receiving threat of the Vessel's arrest, Lauritzen agreed to pay the invoice amount "under protest and without prejudice to any of its rights and/or defenses."[21]

In response to Nalex's First Amended Complaint, Lauritzen filed an amended counterclaim arguing that Nalex is liable for damages because the bunkers allegedly contained excessive cat fines and were therefore off-specification. In its answer and counterclaim, Lauritzen admits that the GTCs "govern the parties rights with respect to the subject bunker delivery" and that Lauritzen is the "Buyer" of the subject bunkers, as that term is defined in the GTCs.[22]

## A.    Nalex supplies bunkers to the Vessel.

In accordance with the Confirmation Order and Nalex's General Terms, Nalex delivered bunkers to the Vessel on April 25, 2022.[23] The physical delivery of the bunkers was performed by Kirby, as Nalex's delivery agent and barge contractor.[24]

During the delivery, Kirby's barge tankerman collected a primary sample of the bunker fuel from the bunker manifold on Kirby barge 27735 (the "barge manifold"), as required by section 5.4 of the GTCs.[25] The primary sample was then divided into four smaller samples. Three of these samples were distributed to resolve any

---

[21] *Id.* at ¶¶ 11, 28, 30, 32.

[22] Lauritzen's Answer at ¶9.

[23] Nalex's FAC at ¶ 11; Lauritzen's Answer at ¶11.

[24] *Id.*

[25] Lauritzen's Answer at ¶11, 13, 24.

commercial disputes between the parties, and one sample was extracted to verify conformity with the permissible fuel emission limits of Annex VI of MARPOL 73/78.[26] The samples were sealed and labeled with serial numbers according to their purpose and custody, and the BDN was signed by the Vessel's Chief Engineer and stamped with the Vessel seal acknowledging receipt of the subject bunkers.[27] The BDN also provides the seal numbers for the samples obtained during fuel transfer:[28]

| | | |
|---|---|---|
| BARGE SAMPLE (SUPPLIER): | SEAL # *1191919* | *1191920* |
| BARGE SAMPLE (VESSEL): | SEAL # *1191918* | |
| MARPOL ANNEX VI SAMPLE: | SEAL # *1191917* | |
| SAMPLES GIVEN TO CUSTOMER | ☑ YES   ☐ REFUSED | |

## B.  Lauritzen complains about the quality of the bunkers.

On or about April 30, 2022, Lauritzen advised Nalex that the Vessel owner's testing of the supplied bunkers purportedly returned cat fines exceeding the tolerable 60mg/kg limits of ISO 8217.[29] The sample tested by the Vessel owner's selected laboratory was allegedly collected from the Vessel's manifold—not from the *barge* manifold, which the GTCs designate as the agreed sampling location for the controlling sample.[30] Lauritzen also cites to another sample purportedly taken from the Vessel's

---

[26] *Id.* at ¶13.

[27] *Id.*

[28] *Id.*

[29] *Id.* at ¶14.

[30] *Id.*; *but see* Lauritzen's Answer & Counterclaim, ¶ 26; *see also* Exhibit 1, at 5.4: "**[i]n order to determine the quality of the Product delivered**, Seller shall be entitled to **draw or cause to be drawn**, samples of each delivery **from Supplier's designated facilities**, and to have them sealed. . . [i]n the event of a quality

10

manifold and also a sample allegedly drawn from the Vessel's fuel tank.[31]  These alleged samples, however, are not the ones that the parties agreed to use.  As detailed below, the official, agreed-upon samples show that the bunkers satisfied contractual specifications.

## C.  Nalex and Lauritzen agree to perform joint testing of a BDN sample.

Acknowledging that the Vessel owner's test results for the samples allegedly obtained from the Vessel's manifold and tanks were not controlling, Lauritzen requested that Nalex suggest an independent laboratory for joint testing of one of the representative samples identified on the BDN.[32] Nalex proposed three independent testing laboratories—AmSpec, Camin Cargo, and Inspectorate—to conduct final and binding testing for cat fines from a BDN sample.[33]

Lauritzen selected AmSpec to perform joint testing of the sample bearing seal number 1191919 as listed on the BDN.[34] Nalex advised Lauritzen that it would proceed with this testing only if Lauritzen first confirmed that AmSpec's results would be final and binding.[35] Lauritzen agreed, responding, "*As to the test results being final*

---

complaint, Seller shall seek to agree with Buyer upon the appointment of an independent inspector to **undertake an analysis of one of the retained samples**." (Emphasis added).

[31] Lauritzen's Answer at ¶14; Lauritzen's Counterclaim at ¶47.

[32] *Id.* at ¶¶ 15,16

[33] *Id.* at ¶ 16.

[34] *Id.* at ¶¶ 21, 23.

[35] *Id.* at ¶16.

*and binding, **we can deal with same as per the supply contract terms**.*"[36] Nalex confirmed the agreement and, relying on it, advised AmSpec to proceed with testing.

## D.   AmSpec's final and binding analysis confirms the bunkers are on-spec.

AmSpec's analysis of sample number 1191919 confirmed that the cat-fine levels were within permissible limits.[37] After receiving AmSpec's analysis, Lauritzen advised Nalex that the Vessel wanted to perform additional testing on the representative sample and also perform further testing of samples obtained from the Vessel's receiving bunker manifold.[38] At Lauritzen's request, sample number 1191919 was retested by NMK Resources, Inc. to confirm AmSpec's analysis.[39] Like AmSpec's test, NMK's retest reconfirmed that the bunkers provided to the Vessel contained permissible levels of cat fines.[40]

Lauritzen admits that every analysis performed on the BDN samples—including those taken from the barge manifold, the composite samples taken from the shore tank, and the composite samples taken from Kirby barge 27735—reveal that any cat fines were well within the agreed permissible levels of ISO-8217.[41]  Lauritzen also

---

[36] *Id.* at ¶20.

[37] Lauritzen's Answer at ¶24.

[38] *Id.* at ¶21.

[39] *Id.* at ¶23.

[40] *Id.* at ¶23, 24.

[41] *Id.* at ¶24; *see also* Lauritzen's Counterclaim at ¶ 48 (ECF Doc. 26) ("In its FAC, Nalex relies on laboratory analyses performed on the BDN samples taken on the barge, composite samples taken from the shore tank, and Kirby barge 27735 for the proposition that the bunkers supplied to the Vessel were on-specification because **the cat fine levels from these samples (ranging from 12 ppm to 34 ppm) were within permissible levels under ISO-8217.**" (emphasis added)).

admits that these samples and tests bind the parties and dispose of the dispute over fuel quality.[42]  Given these dispositive admissions, Lauritzen's counterclaims fail on their face.

**<u>Argument</u>**

**A.    The BDN samples are the only relevant and controlling samples.**

It is undisputed that Nalex's GTCs "govern the parties' rights with respect to the subject bunker delivery."[43] The GTCs expressly provide that only Nalex and its representative—not Lauritzen—has the right to determine where to take the bunker samples to be used for testing in the event of an issue.[44] Section 5.6 of the GTCs provides that, "[u]nless otherwise agreed in writing by Seller, ***only samples provided by Seller to Buyer at the time of delivery shall be deemed representative of the Product delivered***."[45]

This requirement is not only part of the contract, but it makes commercial sense because Nalex loses control and custody of the fuel once it crosses over the Vessel's manifold and into the Vessel's lines or tanks. Nalex has no way to verify the condition of the Vessel's equipment or potential contamination of the fuel once it enters the Vessel's tanks. Thus, the GTCs specify that the samples collected by the

---

[42] Lauritzen's Answer at ¶¶9, 20

[43] *Id.* at ¶9.

[44] *Id.* at ¶18.

[45] *Id.* at ¶26.

13

tankerman from Nalex's delivery barge are controlling for purposes of quality verification. The samples collected by the Vessel's crew have no bearing on this dispute.[46]

Lauritzen contends nonetheless that the samples obtained by Kirby's tankerman cannot be treated as representative of bunkers because they were allegedly taken in a method inconsistent with ISO/FDIS 13739.[47] This argument fails because Lauritzen agreed otherwise: the GTCs expressly permit Nalex, or its representative (Kirby), to decide the "point" and "manner" in which the samples are drawn.[48] Lauritzen could have contracted or mandated a different method for collecting representative bunker samples, but did not. Accordingly, irrespective of Lauritzen's speculation and putative disapproval of the sampling method used, Lauritzen cannot retroactively complain about how the samples were obtained, having contractually left that procedure to the discretion of Kirby's tankerman.

**B.    The result of AmSpec's analysis of the BDN sample is final and binding on Lauritzen.**

Lauritzen attempts to renege and reject AmSpec's results despite the parties' agreement—an undisputed agreement, reached among sophisticated commercial parties, that the results of AmSpec's testing would be final and binding. Lauritzen's challenge to the finality of AmSpec's analysis is an after-the-fact attempt to renegotiate

---

[46] *See* Exhibit 1 at ¶ 5.4 ("In order to determine the quality of the Product delivered, Seller shall be entitled to draw or cause to be drawn, samples of each delivery from Supplier's designated facilities, and to have them sealed.").

[47] Lauritzen's Counterclaim at ¶50.

[48] Lauritzen's Answer at ¶18.

not only the parties' agreement regarding the testing parameters, but the very terms of the sale.

Lauritzen admits that after it submitted its quality complaint, Nalex proposed several potential laboratories from which Lauritzen could choose to conduct joint testing of the BDN sample.[49] Lauritzen selected AmSpec to perform joint testing of the BDN sample bearing seal number 1191919 and advised Nalex that the results of AmSpec's analysis would be final and binding.[50]

Lauritzen admits in its pleadings that it has now tested the BDN samples at least four times (AmSpec's joint analysis, two tests by NMK, and the Vessel owner's own unilateral analysis).  Yet astonishingly, it continues to argue that the samples are not representative of or controlling over the dispute despite clear, undisputed contractual language to the contrary. To allow Lauritzen to evade its agreement in this way would be to impermissibly allow Lauritzen to have it both ways: had the results favored Lauritzen and revealed excessive cat fines, the testing would be final and binding and Nalex would be liable for Lauritzen's alleged damages; but had the results favored Nalex (as they did), then Lauritzen would have yet another opportunity to secure an off-spec test result. Accepting Lauritzen's self-serving interpretation would create an unconscionable result that would contradict the parties' agreed terms. Because it is undisputed that AmSpec's analysis showed that the bunkers were on-spec, Lauritzen's counterclaim fails and must be dismissed.

---

[49] *Id.,* at ¶ 16.

[50] *Id.* at ¶20, 21, 23

Alternatively, even if the Court were to accept Lauritzen's argument that it did not agree to final and binding testing when the parties jointly instructed AmSpec to test the BDN sample, the GTCs unambiguously provide for a similar conclusion in Nalex's favor. Section 5.5 provides that "*[i]f . . . no agreement has been reached by the two parties, Seller reserves the right to have one of its retained sealed samples independently analyzed and for the results **to be final and binding** upon both parties.*"[51] Accordingly, had the parties not agreed that AmSpec's testing would be final and binding, section 5.5 would nonetheless allow Nalex to select a testing laboratory— and again, the ensuing test would be final and binding on the parties. Either way, Lauritzen's contention that final and binding testing has not yet occurred fails as a matter of law.  Not only have such tests occurred, but every analysis performed on the BDN samples has confirmed the fuel was on-spec.[52]

## C.    Nalex's liability is capped at the invoice total.

Nalex denies that Lauritzen is entitled to any recovery. However, because Lauritzen's counterclaim seeks a monetary recovery, any ruling allowing the counterclaim to survive would necessitate a ruling from the Court prohibiting any recovery that exceeds the invoiced amount of the bunkers.

---

[51] Id. at ¶26.

[52] The Vessel also unilaterally decided to test its representative BDN "*Vessel*" sample, bearing seal number 1191918, that was given to the Vessel's Chief Engineer. The test results for the BDN "*Vessel*" sample also revealed that the bunkers contained permissible levels of cat fines. See Lauritzen's Answer at ¶24.

As detailed above, Lauritzen admits that the GTCs govern the parties' rights and liabilities.[53] Section 14.1 of the GTCs provides:[54]

> The Seller and/or Supplier shall not be liable for any special, indirect, consequential, punitive or exemplary damage of any kind including but not limited to loss of prospective profits, anticipated cost savings, contracts or financial or economic loss, claims in tort including negligence of the Seller and/or Supplier, its agents, servants or sub-contractors, arising out of, or in connection with, the performance or nonperformance under the Contract. ***In any event, the liability of the Seller and/or Supplier shall be limited to the price of the Products supplied under the Contract.***

The limitation clause found in the GTCs acknowledged and accepted by Lauritzen confines the maximum amount of damages recoverable. As noted by Fifth Circuit, "under Texas law, 'contracting parties can limit their liability in damages to a specified amount' and 'it is immaterial whether a limitation of liability is a reasonable estimate of probably damages resulting from a breach.'" *Global Octanes Texas, L.P. v. BP Exploration & Oil Inc.*, 154 F.3d 518, 521 (5th Cir. 1998) (quoting *Vallance & Co. v. Anda*, 595 S.W.2d 587, 590 (Tex.App.—San Antonio 1980, no writ)); *Atwood Oceanics, Inc. v. Zust Bachmeier of Switz., Inc.*, No. H-04-4028, 2006 U.S. Dist. LEXIS 25262, at *10 (S.D. Tex. 2006) (upholding damages limitation provision in contract between sophisticated commercial parties).

---

[53] Lauritzen's Answer, at ¶9.

[54] *See* Exhibit 1, at ¶14.1 (emphasis added).

Lauritzen admits that purchase price of the bunkers is $249,804.58.[55] Yet despite contractually agreed limitations as to Nalex's maximum potential liability, Lauritzen seeks to recover $623,117.84—more than twice the agreed maximum.[56] Again, the entire counterclaim should be dismissed.  If it survives, Nalex asks the Court to issue an appropriate ruling (such as a partial judgment under Rule 12(c)) limiting Lauritzen's claims.[57] Because Lauritzen is limited to the contractual remedies permitted by the GTCs, the Court should uphold the maximum damages limitation in the GTCs and summarily preclude any recovery exceeding the purchase price of the bunkers.

### Conclusion and Prayer

Lauritzen admittedly bound itself to the GTCs when it contracted with Nalex for the provision of bunkers for the Vessel. Nalex was within its rights to sample the bunkers in the manner chosen at Kirby's tankerman's discretion, and such samples were controlling with respect to the quality of the bunkers. AmSpec independently tested the sample, and the results of that testing revealed that the bunkers were within the agreed specifications. As Lauritzen further admits, that finding is final and binding as between the parties. Lauritzen's Counterclaim must be dismissed because the GTCs and the results of the testing bind Lauritzen, and Lauritzen cannot now rely on other samples to claim that the bunkers are off-specification. Lauritzen's

---

[55] *Id.* at ¶27.

[56] Lauritzen's Counterclaim, at ¶57.

[57] Lauritzen's attempt to recover both the contract price and the alleged price of the replacement fuels should be also denied as an impermissible double recovery.

counterclaim, which rests entirely on a theory precluded by the GTCs, fails on its face. Because Lauritzen fails to state a claim on which relief can be granted, its counterclaim must be dismissed.

Respectfully Submitted,

NICHOLS BRAR WEITZNER & THOMAS LLP

*/s/ Kip Brar*
Kip Brar
Texas Bar No. 24067333
Federal I.D. No. 1055559
2402 Dunlavy Street, Suite 2000
Houston, Texas 77006
Direct: 713-405-3336
kbrar@nicholsbrar.com

***Attorneys for Plaintiff Nalex Energy, LLC***

**Of Counsel:**

NICHOLS BRAR WEITZNER & THOMAS LLP

Misha J. Paltiyevich
Texas Bar No. 24095695
Federal I.D. No. 3060542
2402 Dunlavy Street, Suite 2000
Houston, Texas 77006
mpaltiyevich@nicholsbrar.com

**<u>Certificate of Service</u>**

The foregoing Motion to Dismiss was served on all counsel of record via the Court's ECF system on January 6, 2023.


/s/ *Misha J. Paltiyevich*
Misha J. Paltiyevich